UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ERIC HUFFMAN, | } |
| | } |
| Plaintiff, | } |
| VS. | } CIVIL ACTION NO. H-08-1541 |
| | } |
| CITY OF LAKE JACKSON, | } |
| | } |
| Defendant. | } |

**OPINION & ORDER**

Pending before the Court is Plaintiff Eric Huffman's motion for partial summary judgment (Doc. 12) and Defendant City of Lake Jackson's response and motion for partial summary judgment (Doc. 19) and second motion for partial summary judgment on the issue of damages (Doc. 22). Upon review and consideration of these motions, the replies and responses thereto (Docs. 23–26), and the relevant legal authority, the Court finds that Plaintiff's motion for partial summary judgment (Doc. 12) should be denied and Defendant's motion for partial summary judgment (Doc. 19) should be granted. Finally, in light of the rulings herein, the Court will reserve on Defendant's second motion for partial summary judgment on the issue of damages (Doc. 22) pending further briefing.

I. Background and Relevant Facts

On May 16, 2008, Plaintiff Eric Huffman ("Huffman") filed suit against the City of Lake Jackson ("City") for unpaid wages and overtime pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. § 201 *et seq.*, and the corresponding sections of the Texas Labor Code. (Doc. 1, ¶1.) Plaintiff filed the instant motion for partial summary judgment

on June 17, 2009, asking the Court to find the Memorandum of Understanding ("MOU") between Huffman and the City void as a matter of law. (Doc. 12, ¶3.) Defendant City filed its response and motion for partial summary judgment on July 23, 2009, asking the Court to find the MOU valid and reasonable as a matter of law. (Doc. 19 at 2.) In a second motion for partial summary judgment on the issue of damages filed on July 30, 2009, the City further requests that, since what it argues are the maximum possible damages of $4,935.57 have already been paid, the Court should dismiss Huffman's claims in their entirety. (Doc. 22 at 8.)

Plaintiff Huffman was employed as a patrol officer for the City from October 1991 to December 20, 2007. (Doc. 19, Exh. B, Huffman deposition at 17, 47, 126–27, Exh. 22.) During his tenure, Huffman became interested in working as a canine patrol officer. (Id. at 50–54.) Despite past disciplinary issues, including alleged problems with the accuracy of his reports, Police Chief Paul Hromadka ("Hromadka") informally offered him the job. (Id. at 128–34.) Subsequently, Huffman formally applied for the position by letter dated May 25, 2005, stating that, "[a]fter much thought, I wish to accept the challenge and new training opportunities associated with this position." (Doc 19-10, Deposition Exh. 12.) From December 7, 2005, until his resignation effective December 20, 2007, Huffman worked as a canine patrol officer for the City. (Doc. 1, ¶7.) One of his primary duties in this capacity was to care for Rip, the City's drug sniffing canine, which entailed, *inter alia*, "bathing, brushing, exercising, feeding, grooming, cleaning of the dog's kennel, training and administering drugs or medicine for illness." (Id., ¶¶8–9.)

Prior to Huffman beginning his service as a canine patrol officer, Huffman and Chief Hromadka discussed the duties and obligations that the job would entail. (Doc. 19, Exh. B, Huffman deposition at 55, 59–77, 78–84.) Huffman understood that the dog could live with him

and that he would need to exercise, groom, and feed the dog, as well as see to its training and medical needs, some of which would need to be done at home while off-duty, in exchange for which he would be paid a one hundred dollar monthly stipend and receive four paid hours off per week. (Id. at 61–64.) This agreement prevailed through March 14, 2007, when Huffman and the City signed the MOU formalizing the duties and compensation of the canine handler. In pertinent part, the MOU stated that in addition to the $100 monthly stipend, the City would pay for the dog's medical and food supplies and that the dog's handler would receive four paid hours off per week for training and maintenance. (Doc. 19-10, Deposition Exh. 17, ¶¶1–2, 6.) It is also noteworthy that Huffman was Rip's owner and accordingly he took Rip with him when he resigned as the City's canine patrol officer. (Doc. 19, Exh. B, Huffman deposition at 115.)

Shortly after Huffman tendered his resignation, he complained in a letter dated December 16, 2007, that he had not been properly compensated for housing and maintaining Rip. (Doc 19-11, deposition exh. 36.) Huffman stated that despite bringing Rip home on December 7, 2005, he only began receiving the $100 monthly stipend from the City on March 1, 2006. (Id.) Furthermore, Huffman claimed that under the FLSA, he was entitled "to one hour of overtime pay at a rate of time and one half for daily maintenance of the canine[,]" including weekends and holidays. (Id.) Huffman's tabulation also does not reflect the four paid hours per week (later changed to eight hours fortnightly at his request) of time off for Rip's care. (Id.) In total, Huffman demanded $20,311.47 in back pay for dog maintenance. (Id.)

The City investigated Huffman's claims and Chief Hromadka responded by letter dated January 24, 2008. (Id.) The letter notes that the prior canine officer recalled handing care of Rip to Huffman during the "latter part of January to the first part of February 2006." (Id.) Nevertheless, because the City's records did "not specifically document when [Huffman]

officially took possession of . . . Rip, [Huffman's] compensation [was] reviewed as a canine handler beginning on December 7, 2005." (Id.) After analyzing Huffman's time sheets for the period from December 7, 2005 to November 30, 2007, the City determined that its "records reflect 168 hours and 46 minutes as uncompensated time owed to you." (Id.) This resulted in a payment to Huffman of $4,935.57, minus the applicable withholding. (Doc. 19 at 9.)

Huffman now sues the City for unpaid wages and overtime pursuant to the FLSA, as well as unspecified liquidated damages for the City's willful refusal to pay. (Doc. 1 at 1–3.) The City contends that after giving Huffman the benefit of every doubt, its payment to him of $4,935.57 represents the maximum legally supportable damages in this case and that therefore the case must now be dismissed. (Doc. 19 at 9 and doc. 22 at 8.)

II. Legal Standards on a Motion for Summary Judgment

A party moving for summary judgment under Rule 56(c) must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). The substantive law governing the suit identifies the essential elements of the claims at issue and, therefore, indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless

of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).

Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323–24. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). Instead, the nonmoving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139–40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075). The nonmovant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Nor is the Court required by Rule 56 to sift through the record in search of evidence

to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins*, Inc., 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198–200 (5th Cir. 1988). The nonmoving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

III. Discussion

The FLSA was enacted in the aftermath of the Great Depression to help eliminate the existence of "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general wellbeing of workers" in industries engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 202(a). It provides that no employer shall employ an employee in an enterprise engaged in commerce for less than a minimum wage. 29 U.S.C. § 206(a). Employees so engaged in commerce or in the production

of goods for commerce are further protected by the overtime provisions of the FLSA, which require they be paid one and one-half times their regular rate of pay for hours worked in excess of forty hours in a workweek.  29 U.S.C. § 207.

It is generally accepted that time spent by a police officer caring for or training his assigned police dog during off-duty hours constitutes compensable work time.  *See Andrews v. DuBois*, 888 F. Supp. 213, 216–17 (D. Mass. 1995); *Levering v. District of Columbia*, 869 F. Supp. 24, 26–27 (D.D.C. 1994); *Truslow v. Spotsylvania County Sheriff*, 783 F. Supp. 274, 277–79 (E.D. Va. 1992).  Feeding, training, exercising, and otherwise caring for a police dog is "indispensable to the dog['s] well-being and to the employer's use of the dog[ ] in its business." *Reich v. New York City Transit Auth.*, 45 F.3d 646, 650 (2d Cir.1995).  As the court in *Nichols v. Chicago*, 789 F. Supp. 1438, 1442 (N.D. Ill. 1992), observed, "in order for the canine patrol officer to properly perform his or her principal activity of canine patrol, the canine portion of the work team must be in proper working order."  Because a basic level of care and attention is essential to a police dog's health and wellbeing, some of an officer's off-duty efforts to care for a police dog clearly amount to work under the FLSA.

Given the obvious difficulty calculating the precise number of hours an employee works at home, 29 C.F.R. § 785.23 provides that "any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted."  Huffman argues that the MOU was "unilaterally imposed" on him by the City, and thus the agreement is void for the purposes of 29 C.F.R. § 785.23.  To support this proposition, Huffman cites *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 526 (2d Cir. 1998).  In that case, however, there was no agreement; without discussion or assent by the plaintiff, the police department implemented a two-hour per week overtime policy for the canine handler.  *Id.*  In contradistinction to this case, in *Holzapfel* the

Second Circuit stated that "while 29 C.F.R. § 785.23 bears no role in this case, we pause to note that this regulation would be a useful tool by which police departments and their K-9 officers could avoid the very problems at issue here." *Id.* at 527. In the instant case, Huffman and the City did reach an agreement regarding Huffman's compensation for his duties as a police dog handler, and that agreement was later memorialized in the MOU. Huffman does not allege that the MOU is fraudulent or that he signed under duress. There is therefore no evidence to support Huffman's allegation that the MOU was "unilaterally imposed" on him by the City.

On the question of reasonableness, the Sixth Circuit has said that the "court's task is not to find *the* reasonable agreement, for none exists." *Brock v. City of Cincinnati*, 236 F.3d 793, 806 (6th Cir. 2001). Rather, "a court must ascertain whether *this* agreement falls within a broad zone of reasonableness, considering its terms and all of the facts and circumstances of the parties' relationship." *Id.* In *Brock*, the Sixth Circuit held that an agreement to pay straight-time compensation of seventeen minutes per day for off-duty dog care was reasonable. By contrast, Huffman was given four paid hours off per week and a $100 per month stipend in exchange for Rip's care, with the City paying for Rip's food, medical care, and training expenses. The City also provided Huffman with a canine equipped police cruiser and a portable outdoor doggy enclosure for use at work and at home. Nowhere in the record is there any indication that Huffman found these terms objectionable or unreasonable.

Taking Huffman's allegations as true for the sake of this Rule 56(c) analysis, the Court finds them insufficient to establish that the MOU was "unilaterally imposed" or void for unreasonableness. Indeed, viewing the evidence in a light most favorable to Huffman, the Court finds that, as a matter of law, the understandings and later MOU between Huffman and the City were mutual and reasonable under 29 C.F.R. § 785.23.

Consequently, the only issue remaining is that of damages. Huffman's damages in this case cannot exceed the compensation to which he was entitled under the agreement. Whether he in fact received the full benefits of the MOU is a question of fact that may need to be resolved at trial. According to the Court's informal calculations, Huffman was officially employed as the City's canine handler from December 7, 2005 to December 20, 2007, or approximately 106 weeks. Under the agreement, then, damages can be computed by the following formula:

> Huffman's hourly wage * 1.5 overtime pay * 4 hours per week *
>
> Number of weeks Huffman did not receive four off-duty hours for canine care +
>
> Number of months Huffman did not receive the $100 monthly stipend * $100 =
>
> Damages.

At trial, it would be Huffman's burden to prove by a preponderance of the evidence the hours and weeks uncompensated by off-duty time and that it was the City's responsibility to schedule such off-duty time. Because it is unclear from the current motions whether Huffman alleges he did not receive the full benefit of his agreement with the City, as well as how the City arrived at the $4,935.57 figure, the Court requests further briefing from both parties on the issue of damages arising under the agreement.

Defendant City is requested to address, using summary judgment evidence, the following question:

1. How was the $4,935.57 figure derived?

Plaintiff Huffman is requested to address these questions:

1. Does Huffman allege further damages under the MOU after the City's payment of $4,935.57 and, if so, in what amount?

2. What evidence does Huffman propose to present at trial to prove his damages?

IV. Conclusion

Accordingly, the Court hereby ORDERS that Plaintiff Eric Huffman's motion for partial summary judgment (Doc. 12) is DENIED.

The Court further ORDERS that Defendant City of Lake Jackson's motion for partial summary judgment (Doc. 19) is GRANTED.

Finally, the Court reserves decision on Defendant City of Lake Jackson's second motion for partial summary judgment on the issue of damages (Doc. 22) and requests further briefing from the parties on the questions above. Both parties are to submit briefs within twenty (20) days and any responses ten (10) days thereafter. This case will now proceed according to the schedule below:

| | |
|---|---|
| **Joint Pretrial Order must be filed by:** <br> Plaintiff is responsible for filing the Pretrial Order on time. | March 15, 2010 |
| **Docket Call is set for 1:30 p.m. on:** | March 26, 2010 |
| **Trial is set for the two weeks starting:** | March 29, 2010 |

SIGNED at Houston, Texas, this 4th day of November, 2009.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE